IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BEND-LAPINE SCHOOL DISTRICT,                     Civil No. 04-1468-AA
                                                  OPINION AND ORDER

            Plaintiff/Appellant,

      vs.

K.H.,

            Defendant/Appellee.
_____

Richard Cohn-Lee
Andrea Hungerford
The Hungerford Law Firm
615 High Street
Oregon City, Oregon 97045
      Attorneys for plaintiff/appellant

Mary E. Broadhurst
Mary E. Broadhurst, P.C.
P.O. Box 11377
Eugene, Oregon 97440
      Attorney for defendant/appellee

AIKEN, Judge:

      Plaintiff/appellant Bend-LaPine School District ("District")

appeals the Administrative Law Judge's (ALJ) decision pursuant to

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §
1412(a). The defendant/appellee, K.H. (K.H.), asserts that the
ALJ correctly held that K.H.'s Individual Education Plan (IEP)
failed to comply with the procedural requirements of the IDEA,
and asks this court to affirm the ALJ's ruling reimbursing K.H.'s
parent the cost of K.H.'s private school placement.

BACKGROUND

_____The specific facts of the case will not be repeated here.
Instead, the court refers to and relies on the ALJ's 41 findings
of fact contained in her Order. Each fact relied on by the ALJ
included a citation to the record, either an exhibit or
testimony.

Generally, K.H. is a fifteen-year-old girl identified as
Emotionally Disturbed (ED). She was identified by the District
as eligible for services under the IDEA. Specifically, the
District found K.H. eligible for special education services which
resulted in an IEP being developed for her. An IEP is a
comprehensive statement of the unique educational needs of a
student with a disability and the specially designed instruction
and related services to be employed to meet those needs. K.H.'s
IEP was drafted on December 19, 2002, and January 7, 2003. K.H.
was educated by the District until April 11, 2003, when her
parent removed her and placed her first in a private three-week
wilderness program ("SUWS"), and then placed her privately at the

Summit Preparatory School following K.H.'s parent's disagreement with the IEP program and placement offered to K.H. by the District. Summit is a private non-profit therapeutic boarding school which combines an "emotional growth" curriculum with academics. K.H. remained at Summit until the school asked her to leave their program in the spring of 2004.

K.H.'s parent filed a request for a due process hearing, pursuant to OAR 581-015-0081. In May 2004, a three day administrative hearing was held. The ALJ ruled in favor of the District on three issues, denying reimbursement for: (1) K.H.'s placement in SUWS, the therapeutic wilderness program; (2) K.H.'s parent's attendance at Summit; and (3) the neuropsychological testing and associated costs administered by Dr. Velan. The ALJ ruled in favor of the parent on one issue, awarding reimbursement for K.H.'s private placement at Summit. The District appeals the reimbursement award for K.H.'s attendance at Summit.

## JURISDICTION

The IDEA confers on any party aggrieved by the findings and decision made in a state administrative due process hearing regarding the provision of a FAPE the right to bring an original civil action in a state court of competent jurisdiction or in federal district court to review the findings and decision. 20 U.S.C. § 1415(i)(2). Federal district courts have jurisdiction over such actions without regard to the amount in controversy.

Id. at § 1415(i)(3)(A).

STANDARDS

The district court's review of the agency decision is somewhat deferential. This review has been characterized as a modified de novo review. Katherine G. v. Kentfield School District, 261 F.Supp.2d 1159, 1167 (N.D. Cal. 2003); and Seattle Sch. Dist. No. 1 v. B.S., 82 F.3d 1493, 1499 (9th Cir. 1996). "Because Congress intended states to have the primary responsibility for formulating each individual child's education, [courts] must defer to their 'specialized knowledge and experience' by giving 'due weight' to the decisions of the states' administrative bodies." Amanda J. ex rel. Annette J. v. Clark County Sch. Dist., 267 F.3d 877, 888 (9th Cir. 2001)(internal quotation omitted). Moreover, the district court must give deference to the state hearing officer's findings, "particularly when . . . they are thorough and careful." Id.

Section 1415(i)(2)(B) provides that the "court . . . shall receive the records of the administrative proceedings . . . shall hear additional evidence at the request of a party . . . and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). The Supreme Court has cautioned that the preponderance of the evidence standard "is by no means an invitation to the courts to substitute their own notions of sound

educational policy for those of the school authorities which they review." <u>Board of Education of Hendrick Hudson Central Sch. Dist. v. Rowley</u>, 458 U.S. 176, 206 (1982). Further, a court must give "due weight" to the state administrative proceedings. <u>Id.</u>

Ultimately, the proper level of deference that the court gives to the ALJ's findings is discretionary, but "increases where [the findings] are thorough and careful." <u>Capistrano Unified Sch. Dist. v. Wartenberg</u>, 59 F.3d 884, 891 (9th Cir. 1995)(internal citations omitted); and <u>Gregory K. v. Longview School Dist.</u>, 811 F.2d 1307, 1310, (9th Cir. 1987)(internal citation omitted).

BURDEN OF PROOF

There is no dispute that the District, as the party challenging the administrative ruling, has the burden of proof on appellate review. <u>Clyde K. v. Puyallup Sch. Dist. No. 3</u>, 35 F.3d 1396, 1399 (9th Cir. 1994).

The parties dispute, however, the ALJ's allocation of the burden of proof at the administrative hearing. K.H. asserts that the ALJ properly allocated the burden of proof to the District to prove compliance with the IDEA. The District asserts that despite controlling Ninth Circuit law, the ALJ should have allocated the burden to K.H. to prove that the District failed to comply with the IDEA. The District relies on the fact that there exists a split in the federal circuits on this issue.

I hold that the ALJ properly placed the burden on the District during the Administrative hearing. See Ms. S v. Vashon Island School Dist., 337 F.3d 1115, 1127 (9th Cir. 2003), cert. denied, 125 S. Ct. 1662 (2005)("[a]t the administrative hearing, the school district has the burden of proving that it complied with the IDEA")(internal citation omitted).

<u>PROCEDURAL HISTORY</u>

K.H. attended 8th grade at Cascade Middle School (CMS), a public middle school in the District. On October 23, 2002, a meeting was scheduled to gather information and to consider referring K.H. for evaluation under IDEA. At that meeting, K.H.'s parent, counselor, and school personnel shared concerns about inappropriate sexual and "touching" behaviors by K.H.

On October 29, 2002, K.H. was suspended from CMS and referred to Deschutes County Juvenile Justice Center Education program for an incident where K.H. kicked a child, tackled the child to the ground and punched the child in the groin. As a result of the incident, the police referred K.H. to the juvenile justice system and the District suspended K.H. from school. K.H. was detained overnight at the Justice Center, where a "Safe Schools Assessment" was completed by a licensed social worker for the Deschutes Mental Health Department. K.H. returned to CMS on November 4, 2002. School personnel developed, and distributed to staff, suggestions for K.H.'s re-entry into regular classes to

alert teachers to possible safety concerns for other students.

Evaluation for IDEA eligibility continued throughout November and December 2002. On November 14, 2002, the IEP team held a meeting with K.H. and K.H.'s parent to discuss K.H.'s needs, particularly the necessity for a functional behavioral assessment and a behavior intervention plan. An IEP meeting was scheduled for December 19, 2002. Before that meeting occurred, however, another incident involving inappropriate touching and sexual harassment was alleged against K.H. On December 5, 2002, K.H. was again suspended from CMS. The CMS disciplinary team met and recommended expulsion based upon this incident, however, because K.H. was undergoing evaluation for special education eligibility, the District decided that K.H.'s behavior was a manifestation of a disabling condition which precluded CMS from expelling K.H.

On December 16, 2002, prior to the IEP meeting, K.H. was withdrawn from CMS and transferred to Second Chance, a behavioral transition program operated by the District, typically scheduled for a 45-day period. This action appears to have been taken as an alternative to expulsion from CMS. Home tutoring was provided by the District previous to, or contiguous with, K.H.'s attendance at Second Chance.

On December 19, 2002, an eight member team participated in K.H.'s IEP eligibility determination meeting. The team

determined that K.H. was eligible for services under IDEA due to her disability of "emotional disturbance."  Mary Borrego, the District's Special Education Evaluator, told the team that the educational impact was not significantly seen through K.H.'s academics but that K.H.'s ability to maintain appropriate behaviors throughout the school environment was "significantly impacted."  The team started to develop the IEP but was unable to complete the process within the time allotted and so continued the meeting to January 7, 2003.

On January 7, 2003, the team reconvened and developed IEP goals for K.H. centered on behavior and decision-making skills. The IEP provided for K.H. to receive the following specially designed instruction: Behavior Plan, to be implemented "throughout the day," in all school settings.  There was no specific period or time noted for the extent of time K.H. would not participate with nondisabled children in the regular education classroom and in the activities described in the statement of special education. The IEP provided for the following aides and services:  K.H. needs to access time out as needed, K.H. was to monitor time outs as needed and was to utilize "selected staff."  No names or location of staff were indicated on the IEP.

The IEP contained three annual goals and related measurable short term objectives.  The team then discussed three possible

placement options, including on-campus at CMS in regular education with support from special education staff within general education classes, on campus placement with special education direct services, an off-campus alternative education program such as Second Chance with part-time on-campus placement with special education support, or placement solely at an alternative program such as Second Chance or Riverbend, a full-day off-campus program modeled on a day treatment program. The team chose Second Chance, where K.H. was already placed, although the IEP called for K.H. to return to CMS for regular math class for ninth period and for supervised study hall for eighth period with Ms. Beckendorf. Notes from the team meeting indicated that K.H. was to be escorted during the transition times at CMS, although the IEP did not contain that specification nor did it designate to whom the responsibility for implementation was designated. The team agreed to reconvene in February for reconsideration of placement with the goal of increasing K.H.'s attendance at CMS to an eventual full-time status. The transition time back to the regular neighborhood school from Second Chance is projected for a period of 45 days.

On February 25, 2003, the IEP team met again to discuss placement options. No revisions to the goals or short-term objectives were discussed. By the meeting date, K.H. had progressed to the highest level at Second Chance. The team

discussed possible placement at a new middle school for the full-day; placement at CMS for half-day and half-day at Second Chance; placement half-day at Second Chance and half-day at an alternative site; placement full-day at CMS; or placement half-day at Second Chance and an additional class or classes at CMS. K.H.'s parent stated that she wanted K.H. to remain at Second Chance and half-day at CMS until after spring break. K.H.'s parent clearly stated that she did not want K.H. to return to CMS full-time. The team decided that K.H. would continue at Second Chance half-day and would continue with two classes at CMS. The team agreed to meet again on March 21, or April 7, 2003. Sometime prior to March 13, 2003, K.H.'s parent communicated to the District a request not to implement the proposed placement back to CMS and requested that the team re-convene to consider placement options.

On March 20, 2003, the IEP team met again to discuss placement options. District personnel stated that they believed K.H. was capable of accessing academic instruction at CMS and would be successful at CMS with some instruction in the areas of organization, coping strategies and classroom expectations. The District also expressed the opinion that IDEA law required placement in the least restrictive environment and that CMS had not had the opportunity to implement an IEP for K.H. Finally, the team agreed to maintain the current placement and to

reconvene on April 8, 2003.

Sometime prior to April 6, 2003, K.H.'s private physician diagnosed her with Bi-Polar disorder and prescribed medications to assist with symptoms. K.H.'s diagnosing psychiatrist supported K.H.'s placement in a short-term residential program such as the wilderness program.

On April 8, 2003, the IEP team met again to discuss placement options. A mediator was tasked with controlling the subject matter of the discussion to focus on placement only. K.H.'s parent stated that she was very concerned because K.H. was continuing to act out at home and was not compliant. K.H.'s parent stated that she was very concerned that K.H. was not ready for transition back to CMS. At the beginning of the meeting, K.H.'s parent distributed copies of a document she had prepared that contained resources for understanding K.H.'s new diagnosis of Bi-polar Disorder. K.H.'s parent included arguments for placement of K.H. in a therapeutic boarding school, and included a very specific draft of a behavior implementation plan to be implemented should K.H. be returned to CMS. The document, however, was not discussed at the IEP meeting as the facilitator would not allow anyone to discuss changes to the IEP.

At some point during the April 8th meeting, the family informed the District that it was applying for a wilderness therapy program for K.H. The District planned, at the end of the

meeting, to transfer K.H. to CMS beginning April 14, 2003.  The
District intended to begin with a half-day at CMS beginning at
lunchtime.  The transition to full-day at CMS was scheduled for
May 5, 2003.

Following the April 8, 2003, meeting, the District issued a
placement revision form for the December 19, 2002, IEP.  No other
amending documents to the District's forms for an IEP were
produced by the District at any subsequent time.  The April 8,
2003, revision form required placement in general education for
part of the day and alternative placement part of the day.  The
form refers the reader to meeting summary notes for explanation
of selection and/or rejection of the specific options discussed.

This proposed addendum to the IEP was generated by staff on
the afternoon of April 8, 2003.  K.H.'s parent was not present.
K.H.'s parent had requested that an IEP meeting be scheduled to
revise the IEP goals and objectives prior to K.H.'s transition to
CMS.  K.H.'s parent proposed April 15 or 16, 2003 for the next
meeting date.  The District sent a Prior Notice of Special
Education Action, dated April 10, 2003, that informed the parent
that the meeting would occur later than requested because: (1)
the parents elected to enroll K.H. in a wilderness program; and
(2) all team members can attend the April 30th meeting.  The
Notice of Team Meeting, issued April 21, 2003, set the next
meeting date as April 30, 2003.  The designated purpose of the

meeting was to "decide whether your child is eligible for/continues to be eligible for special education" and "consider your child's need for transition services[.]"  The box for "develop or review an IEP" was not checked.  The notice was enclosed with a letter stating that the Addendum included in the mailing was a draft only and reminding the parents that a team decision was necessary to amend the IEP.

District notes of the meetings indicate the District would not consider residential placement for K.H. at the District's expense.  Because the team did not meet again after April 8, 2003, the IEP was not formally amended.  The draft addendum produced the afternoon of April 8, 2003, was proposed but never formally adopted by the IEP team.

K.H.'s parent was considering "private based boarding schools with experience working with troubled adolescence and ADHD versus a residential treatment facility" in a written letter to K.H.'s therapeutic care providers and educators on January 23, 2003.  Further, an electronic mail (email) message from K.H.'s group therapy counselor, clearly indicated that K.H.'s parent had indicated pursuing the possibility of residential placement prior to March 12, 2003, the date of the email.  Finally, at the beginning of the IEP team meeting on April 8, 2003, K.H.'s parents informed the team of concerns about, and clear objections to, K.H.'s return to regular education at CMS.

The District was verbally notified of K.H.'s parent's intent to place K.H. in a wilderness program on April 8, 2003, at the last IEP meeting prior to placement. K.H. was placed in the wilderness program on April 11, 2003. On May 1, 2003, K.H.'s parent notified the District of intent to place K.H. in a private, residential placement and of her request to have the placement made at the District's expense. On May 9, 2003, the District issued its notification to the parent that it was refusing to change K.H.'s placement to residential and declining to fund the private placement. Thereafter, on May 15, 2003, K.H. was placed at Summit Preparatory School.

I will not discuss the specifics of the wilderness therapy program as the ALJ denied reimbursement for that placement and the defendant has not appealed that denial. The ALJ did, however, order reimbursement for the Summit Preparatory School, which is a private, non-profit therapeutic boarding school located in Kalispell, Montana. The director of the academic program has a master's level degree in education and classes are provided by full-time certified teachers. The clinical program is directed by a licensed adolescent psychiatrist and services are provided by two full-time licensed psychologists. The school is accredited through the Northwest Association of Accredited Schools and is anticipating completion of the accrediting process for the Office of Public Instruction for the State of Montana.

Class sizes range from two or three students up to ten students.

Upon acceptance and placement at Summit, Summit immediately developed a temporary treatment directive for K.H. based upon K.H.'s initial two weeks of enrollment and the intake/evaluation information. Summit then developed an initial service plan. The plan addressed K.H.'s academic needs as well as her psycho-social needs and provided for assessments to determine progress in all areas. While at Summit, K.H. was provided with a structured environment designed to enable K.H. progress with both psycho-social and academic goals.

<u>DISCUSSION</u>

Essentially, the question before this court is whether K.H. could learn outside of a residential placement. The ALJ answered this question in the negative. I agree.

An "individualized education plan" is the basic mechanism through which the goal of providing a free appropriate public education is achieved for each disabled child. It is a comprehensive statement of the educational needs of a disabled child and the specially designed instruction and related services to be employed to meet those needs. The IEP must include the child's present educational level and goals, specific services to be provided, needed transition services, and criteria for progress evaluation. 20 U.S.C. § 1401(a)(20).

The question for federal courts when reviewing the merits of

an IEP, is whether the program is "reasonably calculated to
enable the child to receive educational benefits." Rowley, 458
U.S. at 207.  The court is aware that the "free and appropriate
public education" (FAPE) to which a disabled child is entitled
under IDEA "does not mean the absolutely best or 'potential-
maximizing' education." Gregory K. v. Longview Sch. Dist., 811
F.2d at 1314.  Instead, "states are obligated to provide 'a basic
floor of opportunity' through a program 'individually designed to
provide educational benefit to the handicapped child.'" Id.
(quoting Rowley, 458 U.S. at 201).  The "'basic floor of
opportunity' provided by the Act consists of access to
specialized instruction and related services[.]" Rowley, 458
U.S. at 179.

       The education of a disabled child should take place in the
least restrictive environment.  34 C.F.R. § 300.552(d).
Residential placement, however, is appropriate for a disabled
child if necessary for her to receive benefit from her education.
If placement in a public or private residential program is
necessary to provide special education and related services to a
child with a disability, the program, including non-medical care
and room and board, must be at no cost to the parents of the
child.  34 C.F.R. § 300.302.

IEP's Procedural Compliance with the IDEA

       The Supreme Court directs that a court's inquiry in lawsuits

brought under § 1415(i)(2) is two-fold. First, a court must

examine whether the District complied with the procedures set

forth in the IDEA. Second, the court must examine whether the

individualized education program developed through the IDEA's

procedures are reasonably calculated to enable the child to

receive educational benefits. Rowley, 458 U.S. at 206-07.

The ALJ first found that K.H.'s December 19, 2002, IEP

failed to comply with the procedural requirements of the IDEA.

The Ninth Circuit has held that only those "procedural

inadequacies that result in the loss of educational opportunity

. . . or seriously infringe on the parent[s]' opportunity to

participate in the IEP formulation process . . . clearly result

in the denial of FAPE." W.G. v. Bd. of Trustee of Target Range

School Dist. No. 23, 960 F.2d 1479, 1484 (9th Cir. 1992)(internal

citations omitted).

The following are requirements for an IEP as specified by

the IDEA:

(A)(I) a statement of the child's present levels of
       educational performance, including -

       (I) how the child's disability affects the child's
       involvement and progress in the general curriculum;

       . . .

(ii) a statement of measurable annual goals, including
     benchmarks or short-term objectives, related to -

       (I) meeting the child's needs that result from the
       child's disability to enable the child to be involved
       in and progress in the general curriculum; and

(II) meeting each of the child's other educational needs
that result from the child's disability;

(iii) a statement of the special education and related
services and supplementary aids and services to be provided
to the child, or on behalf of the child, and a statement
of the program modifications or supports for school
personnel that will be provided for the child -

(I) to advance appropriately toward attaining the
annual goals;

(II) to be involved and progress in the general curriculum
in accordance with clause (I) and to participate in
extracurricular and other nonacademic activities; and

(III) to be educated and participate with other children
with disabilities and nondisabled children in the
activities described in this paragraph;

(iv) an explanation of the extent, if any, to which the
child will not participate with nondisabled children in
the regular class and in the activities described in
clause (iii).

20 U.S.C. §§ 1414(d)(1)(A)(i-iv).  <u>See also</u>, 34 C.F.R. § 300.340

et seq.

The ALJ found that K.H.'s IEP was insufficient in regards to

the adequacy of the statement of K.H.'s Present Level of

Educational Performance (PLEP) regarding the detail necessary to

provide a baseline for the impact of K.H.'s emotional disturbance

disability on her ability to access her education.  The PLEP is

the starting point for determining annual goals under the IEP.

Specifically, an IEP is required to include, "a statement of the

child's present levels of educational performance, including . .

. how the child's disability affects the child's involvement and

progress in the general curriculum[.]"  20 U.S.C. §

1414(d)(1)(A)(I)(1).  Without that baseline of current performance and/or behavior, it is difficult to draft measurable and relevant annual goals.  The District provided the following information regarding K.H.'s "behaviors," presumably based on K.H.'s disability: her behaviors "resulted in short term suspensions," K.H. had been physically and verbally aggressive, and K.H. "had been involved in some sexual harassment incidents." It was further noted that K.H. had difficulty maintaining friendships, verified by the behavioral inventory, and that people "don't always enjoy [K.H.'s] company."  Finally, K.H.'s "inappropriate behaviors interfere with her success in the classroom both socially and academically."

The ALJ correctly found that the statement quoted above was insufficient to determine an accurate baseline of K.H.'s behaviors affected by her disability.  The information explaining K.H.'s current level of performance failed to provide any measurable level of problematic behaviors, including how many times K.H. had been suspended as a result of the behaviors associated with her disability, or how many instances and in what settings had K.H. been verbally aggressive.

Next, the ALJ found that the IEP failed to meet the requirements of the IDEA regarding annual goals. The IDEA requires a statement of measurable annual goals, including benchmarks or measurable short term objectives.  20 U.S.C. §

1414(d)(1)(A)(ii). There are three goals listed in the December
19, 2002 IEP. They are: (1)"[K.H.] will exhibit appropriate work
ethic and behaviors in school and home settings independently 90%
of the time;" (2) "[K.H.] will use age appropriate social sexual
behavior 100% of the time as measured by behavioral referrals and
observations;" and (3) "[K.H.] will apply decision, along and
problem solving techniques in school and home settings 90% of the
time." (sic). The ALJ found that goals one and three were not
measurable and did not comply with the IDEA.

Goal 1 required K.H. to use "appropriate" independent work
ethic and behaviors in school and home settings. The ALJ found
the term "appropriate" vague and relied on the fact that during
the hearing, the person who actually drafted the language at
issue was unable to articulate the definition in this context.
The drafter then referred to a measurement tool that was not
actually attached or clarified until the April 8, 2003, addendum,
four months later. I agree that the goal as written could not be
measured or even clearly defined. The goal contained ambiguous
terms, that were not defined. Finally, the IEP failed to include
any direction or specification for collecting and measuring data
for behavior that occurred in the school setting.

Goal 3 was similarly unmeasurable. Goal 3 directed K.H. to
"apply decision, along and problem solving techniques in school
and home settings." (sic). The ALJ noted, and the hearing

transcript supports the fact that each witness who testified about this goal had a different interpretation of the goal and the accompanying behavioral expectations. Moreover, the District admitted at the hearing that the reference to data from the home setting should not have been included as there is no reliable method to measure behavior and goals in the home setting. Finally, regarding what must be a typographical error, there was never any subsequent effort to correct or explain what the intent of the goal was. <u>See</u> Transcript, Vol. I, p. 92, 161, 280, 287-288; Vol. II, p. 62; Vol. III, p. 196. I agree with the ALJ that the IEP failed to comply with minimal requirements for a statement of measurable annual goals as required under the IDEA.

<u>Statement of Special Education Services</u>

An IEP must contain a statement of special education services to be provided by the District. 20 U.S.C. § 1414(d)(A)(iii). An IEP must also contain a statement regarding the anticipated frequency, location and duration of the special education services to be provided. 20 U.S.C. § 1414(d)(A)(vi). Appendix A of the IDEA regulations states that "[t]he amount of services to be provided must be stated in the IEP, so that the level of the agency's commitment of resources will be clear to parents and other IEP team members." 34 C.F.R. § 300.347(a)(6).

K.H.'s IEP behavior plan provided that specially designed instruction would be provided "throughout the school day." The

ALJ found this designation vague.  I agree.  The hearing
transcript supports this finding.  The District's Special
Education Director stated that the provision was "vague" and
needed to be more specific. Transcript, Vol. I, p. 293.
Further, the person actually drafting the IEP stated that she did
not recall any discussion at the IEP meeting about the amount of
time services were to be provided.  Transcript, Vol. II, p. 118.
I do not find it sufficient that the District's behavioral
specialist testified that the goals were to be implemented
throughout the day "because [K.H.] had access to the ISS [in
school suspension] room whenever she felt like she needed to
problem solve or staff would like to work with her on those
problem-solving areas."  Transcript, Vol. I, p. 162.

I find that the record supports the ALJ's finding that the
provision, "throughout the school day," is vague and indefinite
and fails to make clear to parents or other IEP team members the
District's specific commitment of resources and thus fails to
satisfy 20 U.S.C. §§ 1414(d)(A)(iii) and (iv).

Statements of Supports for School Personnel

An IEP must include, in part: "(iii) a statement of the
. . . supplementary aids and services to be provided to the
child, or on behalf of the child, and a statement of program
modifications or supports for school personnel that will be
provided for the child[.]"  20 U.S.C. § 1414(d)91)(A); 34 C.F.R.

§ 300.347(a)(3).

It is undisputed that the December 19, 2002, IEP contained no provision for "supports" for school personnel. The District asserts that the "IEP team did not determine at the December 19, 2002 or January 7, 2003 IEP meetings that any individualized supports for school personnel were necessary in order for K.H. to advance toward attaining her annual goals, to be involved and progress in the general curriculum, and to be educated and participate with other children." District's Amended Opening Brief, p. 17. Plaintiff responds only that methodology for implementing the behavior plan was so lacking that it would have been "difficult it not impossible to figure out what training was necessary." K.H. Response brief, p. 15.

I do not find an affirmative statement in the IEP or any evidence in the record supporting the District's assertion that consideration was given to supports for school personnel and then discarded as unnecessary because K.H. could "advance toward attaining her annual goals" without those supports for school personnel. I agree with the ALJ that any specific methodology for implementing the stated behavioral plan was nonspecific and vague so that devising training, supports for school personnel, or program modifications would have been difficult. The December 19, 2002 IEP was lacking sufficient specificity to adequately determine what supplementary aids and services might be necessary

to carry out the IEP.  Therefore, the IEP is found legally insufficient on this provision.

IEP's Nonparticipation Statement

_____An IEP is required to include "an explanation of the extent, if any, to which the child will not participate with nondisabled children in regular class[.]"  20 U.S.C. § 1414(d)(1)(A)(iv), 34 C.F.R. § 300.347(a)(4).  This requirement is "designed to ensure that each IEP team carefully considers the extent to which a child can be educated with his or her nondisabled peers; and if the team determines that the child cannot participate full time with nondisabled children in the regular classroom . . . the IEP must include a statement that explains why full participation is not possible."  IDEA, Analysis of Comments and Changes, 64 C.F.R. § 12953 (March 12, 1999).

K.H.'s IEP answers "yes," to the question of whether there was a need for removal from the general education classroom, and then states that "[K.H.'s] behavior has impacted [K.H.'s] participation in General ed school settings."  The ALJ found that placement was "impliedly determined first," and then "goals, objectives, and services afterwards."  I found no statement, as required, that justified K.H.'s removal from regular education.  The ALJ correctly concluded that K.H.'s placement was determined first, and then the IEP was completed with implementation of that placement in mind.

I find that the IEP does not contain a statement in compliance with 20 U.S.C. § 1414(d)(1)(A)(iv) requiring justification or an explanation as to why full participation with nondisabled kids in a regular classroom was not possible.

Extended Year Services

The ALJ found that the IEP failed to consider whether K.H. was in need of extended year services (EYS), another procedural error.

The IDEA provides that "[e]xtended school year services must be provided only if a child's IEP team determines, on an individual basis, in accordance with §§ 300.340-350, that the services are necessary for the provision of FAPE to the child." 34 C.F.R. § 300.309(a)(2). The District contends that the IEP team discussed EYS at the January 7, 2003, IEP meeting and determined that K.H. did not qualify for EYS, as reflected on the IEP. The District further contends that Mary Borrego, who attended the January 7, 2003, IEP meeting testified that EYS was discussed and ruled out at that meeting. Finally, the District contends that K.H.'s parent's reference to "summer placement" or "summer services as appropriate/necessary - day camps/special education summer school" on a list of topics to address at the April 8, 2003, IEP meeting was not sufficient because: "[t]he discussion and determination that a student qualifies for extended school year services because of undue regression and/or

recoupment is a wholly separate matter from whether summer school can or will be made available to the student."  District's Amended Opening Brief, p. 19-20.

I disagree with the District and affirm the ALJ's finding in this regard.  The December 19, 2002, IEP states only that EYS will not be provided for K.H.  I find no evidence in the record that EYS was discussed at any subsequent IEP meeting.  The testimony of Mary Borrego relied on by the District does not indicate otherwise.  Borrego's testimony seems to indicate only that Leigh Beckendorf stated that EYS was not appropriate for K.H.  Finally, the District's argument that K.H.'s parent's failure to use the term "extended year services" rather than 'summer placement' or 'summer school' fails.  K.H.'s parent, as a layperson, adequately raised the issue of extended school services for her daughter by specifically requesting that the team consider school services beyond the school year for K.H.  I concur with the ALJ that failure to consider or discuss EYS was a violation of the requirements of IDEA.

In conclusion, the ALJ found that the December 19, 2002, IEP was procedurally inadequate.  I agree.  The purpose of the IDEA is to provide disabled children with an "individualized educational program."  The IEP should be a comprehensive statement of the educational needs of a disabled child and the specially designed instruction and related services to be

employed to meet those needs.  20 U.S.C. § 1401(19).  The court

is mindful of the Supreme Court's statement that, "[w]hen the

elaborate and highly specific procedural safeguards embodied in

[the IDEA] are contrasted with the general and somewhat imprecise

substantive admonitions contained in the Act, we think that the

importance Congress attached to these procedural safeguards

cannot be gainsaid."  Rowley, 458 U.S. at 205.  In sum, I find

that the procedural errors identified above led to a loss of

educational opportunity, and therefore constitute a denial of

free appropriate public education.

Next, the District contends that the ALJ erred when she

found that the IEP's procedural inadequacies resulted in the

denial of FAPE and therefore did not address whether the IEP was

reasonably calculated to provide educational benefit.

Again, based on the record, I agree with the ALJ that the

December 19, 2002 IEP is procedurally inadequate resulting in a

loss of FAPE.  Once that determination is made, contrary to the

District's assertion, there is no need to then determine whether

the IEP was reasonably calculated to provide educational

benefits.  See Amanda J., 267 F.3d at 895 (declining to address

the question of whether the proposed IEP was "reasonably

calculated to enable [the child] to receive educational benefits"

because the school district failed to comply procedurally with

the IDEA); W.G. v. Board of Trustees of Target Range School

<u>Dist.</u>, 960 F.2d at 1485 (same).

I will note, however, that the record supports the finding that the IEP was not reasonably calculated to provide educational benefit. The IEP team acknowledged that K.H. was in need of social skills training including anger management, yet had no plans to provide this training to K.H. other than the in-school suspension room. Specifically, K.H. was expected to "access time outs when needed," and seek out adult mentors for help. Further, the IEP failed to outline plans for reentry to the classroom when K.H. was removed from the classroom due to behavioral issues. The IEP indicated a reliance on the police for any illegal acts or behaviors by K.H., without a plan for addressing necessary skills to minimize the behavioral issues. The IEP team seemed to acknowledge the importance of creating a behavioral plan for K.H., yet such a plan was never developed until April 8, 2003, and that plan was never finalized. Heeding the Ninth Circuit's direction "not to judge an IEP in hindsight; [but] rather . . . look to the IEP's goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer [the child] with a meaningful benefit," I find that the December 19, 2002 IEP was not reasonably calculated to provide K.H. with educational benefit. <u>See</u> <u>Adams v. State of Oregon</u>, 195 F.3d 1141, 1149 (9th Cir. 1999); and <u>Rowley</u>, 458 U.S. at 207.

<u>K.H.'s Ultimate Placement in Private Programs</u>

_____The December 19, 2002, IEP resulted in placement in a split
program between the alternative school (Second Chance) and,
initially one, and then two, regular education classes.  The
information received from Second Chance via Steve Arnold was that
although the program instituted a behavior management program, it
was generic to all Second Chance students and was not designed
specifically to implement K.H.'s IEP.  The record contains no
data correlating K.H.'s performance at Second Chance to the IEP
goals.  Progress updates from Second Chance continued to detail
K.H.'s behavioral issues, including "distracting others, being
off task, not being prepared for class, and not respecting the
physical boundaries of [K.H.'s] peers."  The record shows that
Beckendorf updated the IEP on March 3, 2003 with progress notes.
She indicated that K.H. "has had no documented incidents
involving inappropriate peer interactions since this IEP begin
using . . . problem solving sheet beginning 3/12/03 as [K.H.]
will be coming to Cascade half-time. Second Chance issued a
progress report on March 10, 2003 for K.H."

The District contends that any deficits in the December 19,
2002, IEP were corrected at the April 8, 2003 IEP meeting.  The
record supports the ALJ's finding that the draft addendum to the
IEP was proposed but never formally adopted and there were no
forms which amended the IEP following the December 19, 2002 IEP.

The court relies on the letter from the District stating that the "addendum is in draft form and nothing has been formalized." There is a second letter from the District to K.H.'s parent providing a copy of the draft addendum stating that "[i]t is important to note that the Addendum is in draft form." Next, there is the contact log kept by Jan Brigham noting that she mailed a "draft of The IEP Addendum" and including a notation that no decision can be made until the next IEP meeting on April 30th. No IEP meeting was held after April 8, 2003. This evidence supports the ALJ's finding that the draft addendum to the IEP was proposed but never formally adopted.

The District contends that it was prevented from fulfilling the requirements of offering FAPE by the actions of K.H.'s parent, first in canceling the April 30, 2003 IEP meeting, and then by removing K.H. and placing her in SUWS. Regardless of the parent's action in cancelling the April 30, 2003 IEP meeting, the District nevertheless was required to conduct the meeting without parental participation. 34 C.F.R. § 300(d). Further, the District argued that its obligation to provide FAPE ended until K.H. returned to the District. K.H.'s parent, however, informed the District on April 8, 2003, that K.H. was being placed in SUWS, a program of limited duration. On April 11, 2003, K.H.'s parent informed the District that K.H. was expected to return to the District on May 10, 2003. K.H.'s parent had not moved from

the school district.  K.H.'s parent then discussed her concerns with K.H.'s IEP and K.H.'s placement in her letter to the District dated April 29, 2003.  In that letter, K.H.'s parent continues to request an IEP meeting to update the IEP and the placement determination.  I find no evidence supporting the District's argument that it considered K.H.'s placement at SUWS to be anything more than a temporary removal from the District, or that K.H.'s temporary removal ended the District's obligation to provide FAPE to K.H. under the IDEA.

At the time of the last IEP meeting, on April 8, 2003, the District had not met its obligation to provide a free appropriate public education to K.H.  This failure continued through May 1, 2003, the date K.H.'s parent informed the District that K.H. was to be placed at Summit Preparatory School, an out-of-state residential placement and requested reimbursement from the District for the placement.

Reimbursement for Private Placements

On May 11, 2003, K.H.'s parent placed K.H. in the Summit Preparatory School, a non-profit, private therapeutic boarding school in Kalispell, Montana.[1]  The IDEA provides for reimbursement for private placement in certain circumstances.  20

---

[1] The court will not discuss the ALJ's denial of program reimbursement for K.H.'s placement in SUWS; for K.H.'s parent's expenses for attending Summit; or for the neuropsychological testing with Dr. Velan and all associated costs.  Neither party appealed these reimbursement denials, moreover, I find these denials appropriate.

U.S.C. § 1412(10)(c); 34 C.F.R. § 300.403; and OAR 581-015-0156 (implementation of the IDEA by the State of Oregon addressing circumstances where the cost to the parents for private placement may be reimbursed). The issue is whether the placement chosen by K.H.'s parent provided an appropriate education. 34 C.F.R. § 300.403(c)(a court may require the agency to reimburse the parents for the cost of enrollment if the court finds that the agency failed to make FAPE available to the child in a timely manner prior to the enrollment and that the private placement is appropriate. A placement by parents may be found to be appropriate even if it does not meet the State standards that apply to education provided by the District).

When considering whether mainstreaming a disabled child is appropriate, consideration is given to: (1) the education value of placement in a regular class; (2) the non-academic benefits of such; (3) the effect the child has on the class; and (4) the costs of mainstreaming. <u>Sacramento City Unified Sch. Dist. v. Rachel H.</u>, 14 F.3d 1398, 1404 (9th Cir.), <u>cert. denied</u>, 512 U.S. 1207 (1994). Consideration of these factors supports the ALJ's conclusion that residential placement, rather than a return to CMS (or mainstreaming), was appropriate for K.H. The record supports the ALJ's finding that K.H. was receiving gradually less academic benefits from her placement at the alternative program, Second Chance, and that her behavioral issues were continuing.

The record also shows that the District was on the verge of expelling K.H. after she had severely disrupted the classroom prior to her placement in Second Chance.

K.H.'s parent attended the last IEP meeting on April 8, 2003. She disagreed with the intended placement change and argued, in written form, the preference for private residential treatment.[2] The ALJ found it was questionable whether K.H.'s parent met the notice requirements for unilateral placement when K.H.'s parent informed the District that K.H. would be placed in what was later determined to be the SUWS Wilderness Program. The failure to provide notice, however, is not fatal to the parent's request for reimbursement. State regulations provide that reimbursement "may be denied" but does not require denial upon failure to properly fulfil the notice requirements. 20 U.S.C. § 1412(a)(10)(C)(iii); OAR 581-015-0156(4)(b)(cost of reimbursement "may be reduced or denied" due to failure to give proper notice).

In order to qualify for reimbursement, the placement chosen by the parent, must be "reasonably calculated to enable the child to receive educational benefits." Florence Co. School District Four v. Carter, 510 U.S. 7, 11 (1993). The ALJ found that reimbursement was appropriate for K.H.'s placement at Summit Preparatory School. The ALJ's conclusion was based on the

---

[2] The IEP was not reviewed at the April 8, 2003 meeting because the facilitator would not allow any discussion other than placement.

following evidence: Summit is a non-profit therapeutic boarding school; the Director has a master's level degree in education; classes are taught by full-time certified teachers; the clinical program is directed by a licensed adolescent psychiatrist; the clinical programs' services are provided by two full-time licensed psychologists; the school is accredited by The Northwest Association of Accredited Schools; the school, in its first year, is anticipating accreditation by the State of Montana's Office of Public Instruction; classes range in size from two to ten students; Summit developed a treatment directive and developed a service plan based on K.H.'s initial two weeks of enrollment and the intake/evaluation information; the service plan addressed K.H.'s academic needs as well as her psycho-social needs and provided for assessments to determine progress in all areas; and while at Summit K.H. was provided with a structured environment designed to enable her to progress with both psycho-social and academic goals.

I find there is sufficient evidence to support the finding that K.H.'s placement at Summit was reasonably calculated to enable her to receive educational benefits. The school was run by qualified personnel. The school was fully accredited with additional accreditation expected, and a full curriculum in place. In addition, the small class size and clinical program assist K.H. in meeting her behavioral goals. Summit also offered

K.H. a highly structured environment designed to assist her in fulfilling her behavioral goals. The record supports the ALJ's finding that the Summit Preparatory School is a setting designed to met K.H.'s unique needs while permitting her to benefit educationally. Further, the clinical program at Summit headed up by a licensed psychiatrist and staffed by licensed psychologists qualify as sufficient support services to permit K.H. to benefit educationally.

The ALJ issued a 25 page single-spaced opinion, after hearing three days of testimony and examining many exhibits. The ALJ reviewed the evidence, and made findings of fact and conclusions of law resolving the case in favor of K.H. The case came to this court with six volumes of transcript, over length briefs, and a box full of copied "relevant" case law. This court read the administrative record, considered any new arguments brought by the parties, and made an independent judgment based on a preponderance of the evidence while giving due weight to the ALJ's determinations. With those considerations in mind, I find that the ALJ was correct in her finding that the District failed to offer K.H. a free and appropriate public education by failing to meet the requirements for developing and implementing an IEP as required by the IDEA. Moreover, I find that the Summit Preparatory School provided an "adequate" educational setting for K.H., and therefore, K.H.'s parent is entitled to reimbursement

for K.H.'s education at Summit as specified by the ALJ.

## CONCLUSION

Plaintiff/appellant's appeal of the Hearing Officer's Decision is denied (doc. 22). The Hearing Officer's decision is affirmed. If the parties are unable to resolve the issue of attorney fees, the following schedule is ordered: defendant/appellee's fee petition is due three weeks after the entry of this Opinion and Order, plaintiff/appellant's response is due two weeks after the fee petition's due date, and defendant/appellee's reply is due two weeks from the plaintiff/appellant's response brief due date.

IT IS SO ORDERED.

Dated this  2  day of June, 2005.


            /s/ Ann Aiken
            Ann Aiken
    United States District Judge